Arville E. McDANIEL, Plaintiff,

v.

Joseph A. CALIFANO, Jr., Secretary of Health, Education and Welfare, Defendant.

No. C–C–76–335.

United States District Court,
W. D. North Carolina,
Charlotte Division.

March 9, 1978.
As Amended March 14, 1978.

George L. Fitzgerald, Charlotte, N. C., for plaintiff.

Harold Edwards, U. S. Atty., Charlotte, N. C., for defendant.

## ORDER GRANTING BENEFITS

McMILLAN, District Judge.

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) seeking review of a decision by the Secretary of Health, Education and Welfare denying his application for disability insurance benefits under 42 U.S.C. § 416(i) and § 423 and for supplemental security income benefits under 42 U.S.C. § 1381a.

Plaintiff filed his applications for benefits on January 29, 1975, alleging that he had become unable to work in November, 1974, by reason of emphysema and asthma. His applications were initially denied, and after a hearing before an administrative law judge the decision adverse to his claims was reaffirmed on July 8, 1976. This became the final decision of the Secretary on October 22, 1976, when the Appeals Council affirmed the decision of the hearing officer. Plaintiff filed this action within the time provided by law.

Both parties have moved for summary judgment, and the case is ready for decision. For the reasons which follow the court concludes that the Secretary's decision is not supported by substantial evidence in the record and must be reversed.

Testimony taken at the hearing and documentary evidence in the record show that plaintiff was thirty-eight years old at the time he applied for benefits, that he had no formal schooling past the middle of the eighth grade and had had no further training except for two years of part time training at a textile school in Belmont, North Carolina. He had held jobs as a mobile home repairman and serviceman, as a doffer and spinner in the textile industry, as a waiter and cash register operator in a delicatessen, and lastly as a dye room helper in a hosiery mill. He left his last job in November, 1974, complaining that he was "smothering to death" and that he was unable to do the lifting work required without becoming exhausted.

Plaintiff's testimony was that he can no longer walk more than half a block without feeling faint, that he does not drive except on rare occasions and then only with his wife sitting beside him in the front seat, that he frequently has difficulty sleeping because of a feeling of choking or smothering when he lies down, that he often has to take naps during the day, that he no longer performs any household chores except those he can do seated and with no significant exertion, that he can still stoop over but can't bend without feeling that his breath is being cut off, and that he experiences approximately six or seven spells of fainting and unconsciousness per month.

Plaintiff testified that he will sometimes pass out while sitting at rest and that he has, on one occasion during a warm day, passed out while walking around his house. He complained about constant pain across his chest and back. The evidence of plaintiff's fainting spells, his difficulty sleeping and his capacity for work around the house was confirmed by the testimony of his wife, including corroboration of specific instances of fainting. Plaintiff's wife testified that she would sometimes have to help plaintiff walk around the house and that he would have to hold to furniture. Plaintiff's testimony regarding the fainting spells was also supported by letters from his wife, his mother and two friends submitted after the hearing before the administrative law judge but available to the Appeals Council.

Plaintiff testified that he takes several types of medication for his emphysema and that some of the medicine makes him very nervous. He takes Librium to offset the effects of the medication. He also stated that his right hand and to a lesser extent his legs were constantly red and sensitive and that the skin of his hand would occasionally crack and bleed. Plaintiff had been given medication for his skin condition, but the record does not show either the severity of the problem or the precise nature of the treatment he had been given. (The only objective medical evidence concerning plaintiff's skin problem is contained in the report of a consultative examination by Dr. Charles D. Williams. Dr. Williams observed: "There are dry scaly lesions of the right palm and similar ones over his shins which tend to crack." Tr. p. 196.)

The objective medical evidence before the administrative law judge all supported a diagnosis of emphysema and chronic bronchitis. Dr. Williams noted that plaintiff had a "rather striking family history" of emphysema, asthma and bronchitis, including several deaths from respiratory causes. Plaintiff was hospitalized in January, 1975, and was examined by Dr. T. A. Will, a general practitioner. Plaintiff was complaining of severe chest pains and was held for observation. Dr. Will and the radiologist both concurred in a finding of pulmonary emphysema and plaintiff was discharged after tests and some symptomatic treatment. Dr. Will also observed that plaintiff was "very tense." (Tr. p. 165.)

Plaintiff's regular physician, Dr. E. E. Marlowe, Jr., examined plaintiff in May and again in June, 1975. At the June examination he treated plaintiff for pleurisy of the left lung and noted that he was wheezing and having difficulty breathing. Dr. Marlowe stated: "This claimant does need a machine treatment weekly as he has a lot of difficulty breathing." (Tr. p. 181.) In a telephone contact with the Social Security Administration on June 23, 1975, Dr. Marlowe appears to have stated that he had only seen plaintiff twice and did not remember him well but that he thought plaintiff could do sedentary work. (Tr. p. 181.) This conclusion conflicted with his written statement immediately after the May, 1975, examination that he found plaintiff to be totally disabled from working. (Tr. p. 178.) Dr. Marlowe examined plaintiff again in December, 1975, and found him to have dyspnea on exertion and to be "four pillow orthocephalic." (Tr. p. 192.) Plaintiff testified that he had to sleep propped upright on pillows in order to avoid the "smothering" feeling. Dr. Marlowe last saw plaintiff, so far as the record shows, on July 29, 1976, when he treated plaintiff for muscle spasms in his legs. Dr. Marlowe noted that plaintiff still complained of breathing problems and stated: "The appearance of this gentleman is a very undernourished person. I feel that he definitely cannot hold a job." (Tr. p. 224.)

The opinion of Dr. Marlowe, though of course not conclusive on the issue of disability, is entitled to great weight; he is the only physician who has had an opportunity to observe plaintiff over any significant period of time. *Oppenheim v. Finch*, 495 F.2d 396 (4th Cir. 1974).

Plaintiff was seen on April 1, 1975, by Dr. O. D. Boyce at the request of the Social Security Administration. Plaintiff complained to Dr. Boyce of "smothering spells," chest pain, dyspnea, nervous spells and poor ability to sleep. Dr. Boyce confirmed the diagnosis of emphysema; his examination found some limitation on chest expansion and a few coarse bronchial rales. Plaintiff's pulmonary function results showed significantly abnormal values, but the therapist administering the test noted that he complained of nausea and did not appear to put forth any effort. The therapist listed plaintiff's cooperation as "poor" and stated that he "felt" plaintiff could do much better.

As a result of the studies done in April, 1975, the administrative law judge concluded that plaintiff should be referred for an additional consultative examination and further pulmonary tests. These tests were performed on March 5, 1976, by Dr. Charles Williams, a specialist in pulmonary diseases. Plaintiff's reported symptoms were consistent with those he had maintained all along. Dr. Williams noted that plaintiff's nervousness was possibly due to the medication he was taking for his emphysema, an hypothesis also advanced by plaintiff. After performing spirometry tests, Dr. Williams deferred his diagnosis, stating: "The serious question raised here is whether or not this patient has significant pulmonary disease vs. a neuro-psychiatric abnormality, or malingering." (Tr. p. 197.) Dr. Williams conceded that his findings and the test results were completely consistent with pulmonary emphysema, but he felt that the pattern shown by the tests was "bizarre" and recommended a further series of tests which were "not susceptible to voluntary manipulation."

On May 17, 1976, the final series of tests were performed. Dr. Williams concluded: "Examination of the chest again reveals diminished breath sounds throughout, however, with the patient encouraged to give maximum effort, there is some improvement in his breath sounds although not quite up to normal levels." (Tr. p. 211.) The doctor's final conclusion is significant and is set out here in full:

"The present spirometric studies appear to be quite valid. Co-operation was better than on previous visit although perhaps still submaximal. There is definite evidence of some airway obstruction. The marked reduction in Carbon dioxide diffusion tends to substantiate the diagnosis of pulmonary emphysema and the arterial blood gas studies showing moderate hypoxemia despite evidence of respiratory alkalosis confirms some degree of overall pulmonary impairment. Other objective evidence of organic disease as noted previously include the elevated hemoglobin and EKG changes. *It is well known that there is no physiologic measurement or group of measurements which correlates directly with ability to perform a given occupation in a person with chronic obstructive lung disease.* Certainly we see many patients with more evidence of impairment than in this case who continue to work regularly. It would appear basically to be a matter of motivation."

(Tr. p. 211–212, emphasis added.)

Upon the objective medical evidence and the testimony presented at the hearing, the court concludes that plaintiff did make out a *prima facie* case of disability sufficient to prevent his return to his former work. The burden of going forward then shifted to the Secretary to establish that given plaintiff's age, education, work experience and residual skills he is capable of performing a specific job which exists in the national economy. *Thorne v. Weinberger*, 530 F.2d 580 (4th Cir. 1976); *Taylor v. Weinberger*, 512 F.2d 664 (4th Cir. 1975).

The evidence upon which the Secretary relies is taken from the testimony of Mr.

James Poag, director of vocational services at the Charlotte Rehabilitation Hospital. Mr. Poag testified on the basis of his examination of the medical records and his observations at the hearing before the administrative law judge. He had not made any independent examination of plaintiff or counseled plaintiff in the past. His testimony was elicited through a series of hypothetical questions, of which the following is significant:

"Q. . . . [C]onsidering his background, age, education, let us assume that the Claimant has all the symptoms and limitations and restrictions and impairments as alleged in the testimony today which, as I listed, say that he cannot walk more than one-half block without resting; that he cannot alternately sit or stand for an eight-hour day; that he has to·lie down to rest during the day; that he has constant chest pains and that he is subject to passing or fainting spells on an infrequent basis.

"Assuming such facts, would the Claimant be able to do any jobs that he had performed in the past?

"A. No, sir.

"Q. Would there be any other jobs that exist in the national economy in the general area where he lives that he could do?

"A. No sir, with these symptoms, I do not think that he would be employable in any job."

(Tr. p. 88.) When asked to drop the assumptions about fainting spells and daytime rest, and add the assumptions that plaintiff would have to work in a dust and lint free environment and that there would be "no significant restrictions as to reaching or performing manipulation with his hands," Mr. Poag again testified that plaintiff could not return to any of his former jobs. He did think, however, that plaintiff could do various types of bench assembly work, or could work as a security guard, cashier or taxi driver, forklift operator, curtain packer or could monitor TV security systems. Mr. Poag could not say whether some of these jobs would or would not involve lint and dust free environments, but

he *thought* that most of them would be free of dust and lint. (Tr. pp. 90–91.) He was then asked:

"Q. If I made another assumption that he would be subject to fainting spells, then I gather that would knock out any of these driving type?

"A. Yes sir, it certainly would eliminate the taxi driver and the forklift truck and the punch press, working around any machinery.

"If these attacks were frequent enough, fainting spells, it would eliminate all the jobs that I have listed."

(Tr. pp. 91–92.) Aside from the opinions of Mr. Poag, Dr. Marlowe and Dr. Williams, the only other evidence concerning plaintiff's employability were two physical capacities evaluation forms completed by Drs. Will and Boyce and a statement from Mr. Gerald W. Price, rehabilitation counselor with the North Carolina Department of Human Resources. Mr. Price stated: "Vocational Rehabilitation Services were not provided to Mr. Arville McDaniel, Sr. because he feels, and I agree, that our services would not enable him to be employable again or to be able to return to work." (Tr. p. 141.) Both doctors concluded that plaintiff was restricted from excess dust and lint; both indicated he could perform simple repetitive operations with his hands. (Tr. pp. 165, 177.)

On the foregoing evidence the administrative law judge concluded that plaintiff was capable of performing several of the sedentary jobs listed by Mr. Poag and was therefore not entitled to benefits. It is clear that the conclusion of the administrative law judge was based on Mr. Poag's opinions and on his refusal to credit the testimony of plaintiff and his wife concerning plaintiff's subjective symptoms—his fainting spells, difficulty sleeping and constant chest pain. (It should also be noted that the administrative law judge did not mention plaintiff's problem with his hand, despite the existence of objective evidence corroborating his complaint. The hypothetical question presented to Mr. Poag, upon which the administrative law judge's finding is based, included an assumption that plaintiff did not have any significant restriction on performing manipulations with his hands.)

■ Subjective evidence of pain or other symptoms may not be sufficient by itself to establish a disability; however, where such evidence is supported by objective indicators of disability it cannot be ignored. *Thorne v. Weinberger, supra* at 583; *Nanny v. Matthews*, 423 F.Supp. 548 (E.D.Va. 1976); *Kelly v. Matthews*, 420 F.Supp. 359 (W.D.N.C.1976); *Young v. Weinberger*, 366 F.Supp. 81 (D.Md.1973). The record shows no objective medical evidence which would negate plaintiff's subjective claims. All the objective evidence clearly points to a chronic respiratory disease. Plaintiff's fainting spells were confirmed by relatives and friends; his complaints of shortness of breath, constant and severe chest pain and nervous spells were repeated to all the examining physicians. His difficulty sleeping was corroborated by the testimony of his wife.

■ It is apparent from the record that the administrative law judge's failure to take plaintiff's subjective complaints seriously was based on inferences he drew from the *initial* difficulty in obtaining valid pulmonary function studies. However, valid test results *were* later obtained by Dr. Williams, and they showed no change in the objective diagnosis made by all other physicians who had seen and treated the plaintiff. Furthermore, Dr. Williams, a pulmonary disease specialist, expressly stated that there is no direct correlation between objective results and the ability of an individual to perform any significant work. His subsequent suggestion that plaintiff's problem was motivation must therefore be counted as speculation. The court concludes that the failure to give weight to plaintiff's subjective symptoms is clear error and that there is no substantial evidence to support the finding that plaintiff is capable of performing any significant work.

IT IS THEREFORE ORDERED that the Secretary's motion for summary judgment is denied, and plaintiff's motion for summa-

ry judgment is allowed. The decision of the Secretary is reversed and the case is remanded to the Secretary who shall award plaintiff the disability and supplemental security benefits to which he is entitled based on the appropriate date of commencement of disability.